[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 05, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-11373

_____

D.C. Docket No. 00-2108-CV-RAL

TAMPA BAY SHIPBUILDING &
REPAIR CO.,

Plaintiff-Appellee,

versus

CEDAR SHIPPING CO., LTD., et al.

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(February 5, 2003)**

Before BLACK and MARCUS, Circuit Judges, and MIDDLEBROOKS[*], District
Judge.

MIDDLEBROOKS, District Judge:

_____

[*]Honorable Donald M. Middlebrooks, United States District Judge for the Southern
District of Florida, sitting by designation.

This case originated in the district court as a claim in admiralty to recover payment for repair services rendered by Tampa Bay Shipbuilding & Repair Company ("Tampa Bay") upon the ocean-going bulk carrier M/V Red Cedar (the "Ship"). Defendants/Counter-Plaintiffs/Appellees, Cedar Shipping Co., Ltd., et al., (hereinafter, "Cedar") appeal from a final judgment entered by the district judge below after a five-day bench trial in favor of Tampa Bay, awarding it the entire amount of its claimed damages, and dismissing Cedar's counter-claim in its entirety. For the reasons set forth below, we find that the district court's judgment should be affirmed.

I

On or about July 23, 2000, the Ship, an ocean-going bulk carrier of over 38,000 tons, valued at approximately twenty-five to thirty million dollars, dragged anchor and grounded in Port Alfred Anchorage, Canada. Cedar contacted Tampa Bay to obtain a quotation for dry docking the vessel and performing repairs on the rudder, rudder stock and other miscellaneous items.

On August 8, 2000, Tampa Bay submitted a quotation to Cedar, which included fixed prices for certain aspects of the work. However, as the damages to the Ship would not be known until the Ship was brought into dry-dock and inspected, the quotation provided that repairs to the rudder and the rudder-stock

2

would be made by change order.[1]  No set time period was set forth for completing the repairs, but the quotation did set forth a daily lay charge of $10,919.[2]

The transmittal letter for the quotation provided the following pertinent provisions: (1) the quotation would be "subject to [Tampa Bay's] standard terms and conditions or a mutually agreeable contract;"(2) normal work days would be 8 hours, 2 shifts, Monday through Friday; (3) labor rates for additional "time and material items"[3] would be $39.50 per hour for straight time work or $49.00 per hour for overtime work; and (4) the cost of any necessary repair materials not listed in the quotation would be at a rate of "cost plus 15%."  The quotation also included a price of $12,230.00 for removal and reinstallation of the rudder blade and stock, specifically noting that the stated price was for "reasonable effort only."

Cedar accepted this quotation via facsimile on August 9, and added two terms to which Tampa Bay had orally agreed: (1) a 10% discount on the final bill, and (2) a payment of 50% of the final bill upon completion of the work, with the remainder due and payable sixty days after the Ship's departure from dry-dock.

---

[1]  Change orders are essentially separate agreements as to the damage and the repair work thereto.

[2]  A "lay day" charge is the cost for keeping a ship in dry-dock while repairs are being effectuated.  Dry-dock refers to storing the boat out of the water during repairs.

[3]  Repairs not listed in Tampa Bay's quotation or ascertainable until after inspection of the damage.

Tampa Bay confirmed its acceptance of the additional terms on August 11, 2000.

The Ship arrived at Tampa Bay's repair facility on August 24, 2000. Mr. Rafaello Corradi, Fleet Manager of Shipping Services for Cedar ( "Cedar's Representative"), signed a work order containing Tampa Bay's standard terms and conditions on that same date.[4] Cedar's representative testified that he signed the work order with full knowledge that he was accepting the terms and conditions recited on the reverse side of the form, and that he knew that he was binding Cedar to those terms and conditions. The above terms and the one that follows are those that are relevant to the issue addressed in this appeal:

> (5)  Unless otherwise agreed in writing all work performed hereunder shall be billed on a "time and material" basis in accordance with [Tampa Bay's] current published rates, a schedule of which is available upon request and storage of the vessel or marine equipment before commencement and after completion of such work shall be billed at [Tampa Bay's] then standard rates.

After the Ship was dry-docked, Tampa Bay commenced repairs and attempted to remove the rudder and rudder stock. During the course of removing

---

[4] Due to an incompatibility with the available electricity generator, the Ship was not dry docked until August 25, 2000. The record below established that in addition to Mr. Corradi, the Owner's Representative consisted of some "Certification Class" personnel. The Certification Class personnel were responsible for dictating which repairs would be acceptable to continue classifying the Ship within its particular class. Without Class approval, the Ship would not be able to resume full operations. As used herein, Cedar's Representative does not distinguish between Mr. Corradi or members of the Certification Class, as both had authority to dictate the course of repairs.

4

the rudder and rudder stock, it became apparent that the rudder had sustained substantial damage and would require extensive repairs.  During the course of these repairs, Tampa Bay issued thirty-seven condition reports to Cedar.[5]  Out of these thirty-seven, Cedar's Representative signed and agreed to pay the proposed price for fourteen of the thirty-seven reports.[6]

On October 10, 2000, Tampa Bay concluded repairs to the Ship and presented Cedar with an invoice totaling $1,035,554.50, consisting of the agreed base contract amount of $172,313.00, $162,559.00 for the agreed extras represented by the fourteen signed condition reports, $198,408.50 for the remaining twenty-three condition reports, and $502,274.00 for forty-six lay days.[7]  The parties entered into an agreement whereby Cedar would pay the undisputed charges less the agreed upon discount, and place the remainder due into an escrow account.[8]

---

[5] Condition reports were considered to be "change orders" identifying work that Tampa Bay considered to be "extra" and proposing a fixed price for such work.

[6] The agreed value of these fourteen condition reports was $162,559.00.

[7] For some of the remaining unsigned twenty-three reports, Cedar admitted that Tampa Bay was entitled to compensation for the work performed, but wanted to negotiate an agreed price for the work represented after the final bill was issued.  Cedar either disputed entitlement to payment of the remaining condition reports or did not address them at all at trial.

[8] The undisputed amount represented the base contract price, the fourteen agreed-to condition reports and eighteen lay days, for a total amount of $424,314.00 after applying the agreed upon ten percent discount.  Cedar also deposited $100,000 into the escrow account to secure Tampa Bay's attorney's fees, resulting in a total of $507,585.75.

## II

Tampa Bay filed suit to recover the remaining amount of its invoice. Cedar counter-claimed for return of the escrowed funds and for revenue it lost during the prolonged repairs.[9] Discovery commenced and Cedar identified two experts, Mr. Jack Schermond and Mr. Carl Cederstav, and provided their reports and summaries to Tampa Bay. In the Joint Pre-Trial Statement, Cedar identified these same two experts as their trial experts, but Tampa Bay did not identify any trial experts. However, Tampa Bay did disclose that it anticipated calling several of its employees and/or officers to testify as to the reasonableness of its charges and the time to complete repairs to the Ship.

On or about September 28, 2001, Cedar filed a motion *in limine* seeking to preclude Tampa Bay from presenting this lay witness opinion testimony during trial. Specifically, Cedar sought to preclude Michael Mikolay, Paul Hillis, Sydney Jenkins, and Walter Hartley, Jr., Tampa Bay officers and/or employees,[10] from offering lay opinion testimony on the reasonableness of Tampa Bay's charges and time required to complete the repairs. The district judge denied the motion without prejudice to present it should the need arise in trial. Over Cedar's objections,

---

[9] Cedar also filed a motion to compel Tampa Bay to post counter security.

[10] Mr. Jenkins was a long-time Tampa Bay consultant working closely on the Ship project.

6

during the trial, the district judge formally denied the motion and permitted the four witnesses to offer testimony regarding the charges.

## III

On appeal, Cedar raises some fifteen issues which are better broken down into five (5) distinct categories. They are whether the district judge: (1) improperly admitted lay opinion testimony under the recently amended Federal Rules of Evidence 701; (2) made clearly erroneous findings of fact as to the reasonable costs and time required for the repairs; (3) improperly interpreted the contract between the parties to exclude consequential damages; (4) erred by denying Cedar's motion for counter-security; and (5) improperly granted 18% prejudgment interest. Because of the lack of cases addressing Rule 701 since its amendment in 2000, we address the first category herein as to lay opinion testimony. We affirm the remaining categories without discussion. *See* 11th Cir. R. 36-1.[11]

---

[11] 11th Cir. R. 36-1 provides:
> When the court determines that any of the following circumstances exist:
> (a)     judgment of the district court is based on findings of fact that are not clearly erroneous;
> (b)     the evidence in support of a jury verdict is sufficient;
> (c)     the order of an administrative agency is supported by substantial evidence on the record as a whole;
> (d)     summary judgment, directed verdict, or judgment on the pleadings is supported by the record;
> (e)     judgment has been entered without a reversible error of law; and an opinion would have no precedential value, the judgment or order may be affirmed or enforced without opinion.

A

We review a district court's evidentiary rulings for abuse of discretion. *United States v. Awan*, 966 F.2d 1415, 1429 (11th Cir. 1992). A district court's evidentiary rulings are not subject to reversal on appeal absent a clear abuse of discretion. *United States v. Mendez*, 117 F.3d 480 (11th Cir. 1997); *Walker v. NationsBank of Florida, N.A.*, 53 F.3d 1548, 1554 (11th Cir. 1995). This standard of deference is even greater when the objected-to evidentiary ruling is made during a bench trial because it is presumed that the district judge will rely only upon properly admitted and relevant evidence. *See United States v. Dillon*, 473 F.2d 966, 973 (5th Cir. 1973).[12]

B

As stated previously, Cedar filed a motion *in limine* to exclude certain opinion testimony by Mr. Mikolay, Mr. Hillis, Mr. Jenkins and Mr. Hartley. The district judge denied that motion without prejudice to reassert it should the objected-to testimony be presented at trial. At trial, the judge formally took that motion up for the first time during the following testimony by Mr. Mikolay:

> Q. Can you confirm for us that this figure shown on the spreadsheet here is the total amount of the bill on the job?

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), we adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

A.    Yes . . . .

Q.    Was there ever any point in this whole process where [Cedar] communicated . . . with you . . . that [it] had any particular specific problem with the means and manner by which the shipyard was going about the job?

A.    No . . . .  The only thing I did hear from [them was] some gruntle [sic] about time frames for different tasks of the job.

Q.    Did [they] ever instruct you to do any work on this job that you failed to do?

A.    No.  I done everything [they] requested us to do.

Q.    Did you carry out all the work that you did in accordance with [their] instructions?

A.    Yes, we did.

Q.    In the light of 20/20 hindsight sitting here in the court, do you know of anything that you could have done that would have sped this job up if you would have done it differently?

A.    The only thing I would – I would say is probably we should have cut the rudder.  But the other work, I couldn't see how else to do it.  Maybe I could have built a stronger jack on day one of the tiller.  That might be the only thing I can say.

Q.    Well, was it your decision as to whether to cut the rudder or to do the this weldment and rebore this hole?

A.    No, it's not my decision.  We suggested options and [certification class representatives and Cedar] chose which way – which methods.

Q.    Did the yard complete all the work that they were asked to do?

9

A.      Yes we did.

Q.      And was all of it tested, inspected and accepted by the owner and the class surveyor?

A.      Yes it was.

Q.      And did it all work properly during these tests?

A.      Yes, it did.

Q.      Were the charges that you put on these condition reports that we've offered into evidence, Exhibits 5 to 37, all reasonable charges?

(Trial tr., Vol. 4, 205-07).

At this point, Cedar's counsel objected to what they termed expert evidence being offered by a lay witness without proper expert disclosure. Specifically, Cedar's counsel asserted that Mr. Mikolay's testimony regarding the reasonableness of Tampa Bay's charges went to the ultimate issue of the case and was technical and scientific in nature. This meant, according to Cedar, that the testimony, under the new version of Rule 701, required expert evidence in compliance with 702 and Rule 26(a). Claiming that no expert had been disclosed to them as required by Federal Rule of Civil Procedure 26, Cedar requested that the testimony be excluded.

Counsel for Tampa Bay asserted that the testimony should not be excluded under Rule 701, even as amended, because the commentary to the Rule specified

10

that the amendment was not intended to effectuate any changes upon application of Rule 701 to the testimony by business owners and officers.

Cedar's objections centered around the concept that any testimony as to "industry standards" and reasonableness are necessarily precluded due to Rule 701's 2000 amendment. Specifically, Cedar asserted that under 701(c), the commentary would permit testimony by a business owner as to the value of its business, but not as to the where that value fell among industry standards. In denying Cedar's motion *in limine,* the district judge stated that:

> I've read the rule and I've looked at the amendments and obviously the commentary . . . [a]nd . . . it says, for example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business without the necessity of qualifying the witness as an accountant, appraiser or similar expert.

(*Id.* at 224).[13]

Further, the judge found that the commentary to Rule 701 after its amendment contained the statement that "such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue

---

[13] The district judge specifically relied upon *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153 (3rd Cir. 1993), a pre-amendment case which found no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages as it was based on his knowledge and participation in the day-to-day affairs of the business.

11

of his or her position in the business," and that this statement was particularly on point as far as the admissibility of at least Mr. Mikolay's testimony was concerned:

> It seems to me that fits Mr. Mikolay. He's the project manager. He's a superintendent, whatever you want to call him. He oversaw the project. From what I can glean from his testimony, this is his business. This is what he does for Tampa Bay . . . . [H]e makes estimates, sets prices. That's what he does. And obviously, he's accountable for that. Based on his testimony, if he is to be believed . . . he was quite concerned towards the end there that there was all this . . . work that was not going to be paid for. But it seems to me that by virtue of his position in the business, he should be able to testify that the hours that I estimated and the work that I've charged for is reasonable. So I'm going to go ahead and let him testify.

(*Id.* at 225).

Cedar next objected to the testimony of Paul Hillis, president of PG & H Engineering, Inc. ("PG & H"), the subcontractor responsible for the repairs to the rudder and rudder stock. PG & H's business is heavy engineering work on rudder, rudder stocks, propellers, etc. Mr. Hillis supervised a portion of the work, but assigned an employee to conduct the day to day oversight of the project. Mr. Hillis testified that after his initial meeting with Mr. Mikolay regarding the Ship's rudder and rudder stock repairs, PG & H issued an estimate for repairs to the rudder.

> Q.   Okay. Now was [the] estimate based upon the information that came out of that first meeting with the shipyard and the owners?

12

A.    I would presume so.

Q.    Okay. And can you give us . . . a brief rundown of the work that PG & H was estimating in [the] document.

A.    Yeah. We were going to check to see how bent the rudder was and machine the pintle, oversize . . . as required. We were going to supply a piece of material to make a pintle; check the . . . rudder for straightness and, as it says there, subject to compound bends, which makes it a lot more complicated to repair; mill the face of the palms and take the holes oversize to straighten it all back together with everything back true and square to each other, and supply a piece of stainless steel liner for the replacement pintle.

Q.    What was the estimated cost of that work?

A.    $30,000.

Q.    Was that just an estimate or was that an actual quotation from PG & H for this work?

A.    Well, it was an estimate, because whenever you get into straightening, I will never give a hard dollar estimate for straightening anything.

Q.    Now, speaking of straightening . . . if no compound bends are present. What is it that you mean by compound bends there?

A.    It's . . . bends in more than one plane simultaneously, i.e., instead of just being a simple bend like so, it may be bent this way and that way and all over the place. And obviously that is a hell of a lot more difficult to repair than just a simple bend.

Q.    So at the time that you prepared [the] estimate, is it fair to say that PG & H did not know the full extent of the damage to the rudder stock?

A.    That's correct.

(Trial tr., Vol. 5, 87 - 88).

13

Mr. Hillis then testified regarding numerous subsequent work orders and quotations between PG & H and Tampa Bay for additional repair work to the Ship's rudder, rudder stock and pintles. (*Id.*at 91 - 94). He further testified that he had recommended cutting the rudder apart to enable a true repair, but that Cedar had requested that PG & H attempt to realign the rudder by welding the bores and making adjustment for everything that was bent despite his opinion that a true repair was the better option. (*Id.*at 94- 98). The repair to the rudder proceeded around the clock. Cedar's Representative determined that the rudder stock needed to be straightened by a heating process called normalizing. PG & H did not have machinery that was capable of heating to the normalizing temperature of the rudder stock, so it was sent elsewhere to have the normalizing done. When it was returned to PG & H, it was more bent than it had previously been. (*Id.* at 110-114). PG & H then attempted to and was successful in straightening the rudder stock.

Q.   What is the total amount of the [final] invoice?

A.   $114,537.

Q.   Has PG & H been paid [by Tampa Bay] for that work?

A.   Yes . . . .

Q.   Does the invoice detail all of the work that . . . PG & H performed?

A.   Yes . . . .

14

Q. And did PG & H actually perform all of this work?

A. Yes, we did.

Q. Did it do so within a reasonable time?

A. Well, we worked all of the hours we could work.

Q. And did you have any complaints about the quality of the work performed by PG & H?

A. No, we didn't.

. . .

Q. Did you determine that the work was being performed properly?

A. The work was being done in accordance to normal engineering standards.

Q. Okay. Are your charges in line with similar services provided by other similar operations as PG & H?

(*Id.* at 125-127).

At this point, Cedar's counsel once again objected stating the same "expert testimony" basis for exclusion of the testimony. Tampa Bay's response was similar to its previous response regarding Cedar's objection to Mr. Mikolay's testimony. The district judge overruled the objection for the same reasons that he had regarding Mr. Mikolay's testimony and also stated that Mr. Hillis was "integrally involved in [the] whole case," and his testimony was helpful to the

15

judge's understanding of the case.[14]

Cedar next objected to the testimony of Sydney Jenkins. Mr. Jenkins was a consultant working with Tampa Bay in the areas of cost estimating, bid price review and contract administration among other things. He testified he became involved in the situation with the Ship a few days after its arrival when repairs to the rudder first appeared problematic. He was thereafter directly involved in observing the repairs and communicating with Cedar regarding their perceived dissatisfaction with the progress of the repairs. At trial he testified, in pertinent part, as follows:

> Q:   Did you familiarize yourself with the substance of the work the yard had done and with the prices that were displayed and evidenced [by the] condition reports . . . ?
>
> A.   Yes, I did.
>
> Q.   And based on your experience as an estimator in the shipyard business for 15 years, were those fair figures?
>
> Mr. Tisdale:        Your Honor - -

---

[14] Cedar's counsel further defined his objection as relating to Mr. Hillis' testimony that his company's rates were reasonable as far as the industry was concerned, an area, in Mr. Hillis' opinion, more properly within the realm of expert testimony. *Id.* at p. 128. In response, Tampa Bay's counsel responded that the testimony was a factual one addressing day-to-day business information regarding what PG & H's competitors were charging for similar work. The district judge asked Mr. Hillis whether he knew what PG & H's competitors were charging for similar work. He answered that he did. The judge then asked him whether PG & H tried to stay competitive with these other companies' prices. When Mr. Hillis replied that PG & H did in fact do so, the district judge overruled the objection and allowed Mr. Hillis to testify that PG & H's rates were fairly standard in the industry.

A.     They were fair.

Mr. Tisdale:     I object at this point.  This is again expert testimony, number one.  Number two, for - - so, just so the record is clear, so for all the reasons we have discussed with Mr. Mikolay and with Mr. Hillis, I repeat those same arguments.

But number two . . . , the question he's being asked is, is that number fair and reasonable, and that is not something he can do because he did not see the work being performed . . . .  701 (a) specifically requires that it be within the witness' perception and there is no reference to him ever seeing any of this work being done.

(Trial tr., Vol. 6, 16).

The last witness that Cedar objected to was Walter Hartley, Jr., president and chief executive officer of Tampa Bay.  Mr. Hartley had over thirty years of shipyard experience in both billing and repair practices, among other areas.  He was responsible for approving the quotation issued for repairs to the Ship.  At trial Cedar made a Rule 701 objection to the following testimony:

Q.     Now . . . [d]id you quote [Cedar] a figure for a daily lay day rate of $10,919 . . . ?

A.     Yes, sir.

Q.     How does that rate compare to your competitors on lay days?

Mr. Tisdale:     Objection, Your Honor.  I believe that is calling for expert testimony.

The Court:     No, I don't think so.  I mean, the man is in the business, I

17

hope he knows what his competitors are making or charging.

IV

At oral argument, Appellant invited us to take up the question we left open after deciding *United States v. Novaton*, 271 F.3d 968, 1009 n.9 (11th Cir. 2001). The question we left open was whether the 2000 amendment to Rule 701, specifically the addition of subsection (c), would require exclusion of a police officer's testimony interpreting code phrases used by criminal defendants rationally based on their own perceptions and experience.

In *Novaton*, criminal defendants challenged the admissibility of testimony by agents and their supervisors as to the meaning of several code words used by the defendants. The agents had monitored the wire taps of the defendants. Over the objections of the defendants, the trial court had admitted the testimony of the agents regarding their understanding of certain phrases such as "fifteen year old girl" or "fifty year old grandmother" to refer to specific quantities of cocaine (15 and 50 grams respectively).

The defendants in *Novaton* argued that the testimony should have been excluded because the government had not disclosed the agents as experts, and they were testifying as to an area where an expert could provide testimony. We held that the district court did not abuse its discretion in admitting this testimony

18

because our prior precedent, (at least with respect to the pre-amendment version of Rule 701) did not prohibit a lay witness from testifying to a matter simply because an expert could also testify as to that matter.

Similarly, in *United States v. Myers*, 972 F.2d 1566, 1577 (11th Cir. 1992), we held that a police officer's testimony that a "reddish burn mark on a victim's back [was] consistent with marks that would left by a stun gun" did not fall outside Rule 701 because it was premised on "rational perception" based in part on the witness' past experiences. The *Myers* defendant argued, as Cedar does herein, that the information "went beyond the everyday common knowledge of a lay person." We rejected this argument finding that the officer's testimony was "rationally based on his personal perception of [the victim's] back and his nineteen years of experience in the police force." *Id.* We further held, as reiterated in *Novaton*, that "[t]o the extent that [the witness's] opinion lacked a technical/medical basis, [the defendant] had the opportunity to expose this on cross-examination" and the defendant's objections more properly went to the weight and not the admissibility of the evidence.[15]

---

[15] *See also Agro Air Assoc.'s, Inc. v. Houston Cas. Co.*, 128 F.3d 1452 (11th Cir. 1997) (holding that testimony of company's employees and officers relating to the ultimate issue in the case – whether defendant's actions were the cause of the company's inability to obtain an affordable insurance policy – was admissible under Rule 701 because the appellant had the opportunity to cross-examine the witnesses and so any objection to the testimony went to its weight not to its admissibility).

V

Before its amendment in 2000, Rule 701 provided that:

> If the witness is not testifying as an expert, the witness'
> testimony in the form of opinions or inferences is limited
> to those opinions or inferences which are (a) rationally
> based on the perception of the witness, and (b) helpful to
> a clear understanding of the witness' testimony or the
> determination of a fact in issue.

FED. R. EVID. 701 (amended 2000).

In 2000, Rule 701 was amended to include an additional subsection which reads as follows: "*and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.*" *Id.* (emphasis added).[16]

The Advisory Committee Notes to amended Rule 701 explain that the addition of subsection (c) was an attempt "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of

---

[16] Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

*Id.* at Rule 702.

proffering an expert in lay witness clothing." The notes further explain, however, that the amendment was:

> not intended to affect the "prototypical example[s] of the type of evidence contemplated by the adoption of Rule 701 relat[ing] to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.

FED. R. EVID. 701 advisory committee's note (citing *Asplundh Mfg. Div. v. Benton Harbor Eng'g,* 57 F.3d 1190, 1196 (3d Cir. 1995).

Further, the Committee notes specifically discuss testimony by business owners or officers and explain that

> most courts have permitted [owners and officers] to testify . . . without the necessity of qualifying the witness as an . . . expert . Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of *the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis.*

*Id.* (emphasis added) (citation omitted). Reading these two comments together, it would appear that opinion testimony by business owners and officers is one of the prototypical areas intended to remain undisturbed.

A memorandum from the Advisory Committee on Evidence Rules to the Chair of the Standing Committee on Rules of Practice and Procedure further lends

21

credence to this interpretation. *See* Memorandum from the Advisory Committee on Evidence Rules, to the Chair of the Standing Committee on Rules of Practice and Procedure (May 1, 1999) (on file with the Administrative Office of the United States Court) (the "Memo"). In the Memo, the Rules Committee explained that it had published an original proposed revision to Rule 701 and had issued the proposed rule for public comment. As issued for public comment, Rule 701(c) provided that lay opinion testimony could not be admitted if it was based on "scientific, technical or other specialized knowledge." The "within the scope of Rule 702" language was not in the proposed rule.

The Memo went on to explain that the "public comment on the proposal was largely positive," but also noted that the major source of objection had come from the Department of Justice ("DOJ"). Specifically, the DOJ was concerned that the inclusion of the term "specialized knowledge" would result in just the conclusion Cedar asks us to make here, a determination that anyone who testifies based on specialized knowledge they possess, whether through experience or professional learning, is subject to expert disclosure rules.

The Committee carefully considered the DOJ's objections and determined that further revision was necessary in order to clarify that the amendment was not intended to "prohibit lay witness testimony on matters of common knowledge that

22

traditionally ha[d] been the subject of lay opinions." *Id.* at 5. In order to address the DOJ's concern, the Committee added a further modification of the words "specialized knowledge." As revised, the Rule now "provide[d] that testimony [could not] qualify under Rule 701 if . . . based on 'scientific, technical or other specialized knowledge *within the scope of Rule 702*.'" *Id.* (emphasis in original).

Summarizing the above revision, the Committee stated that the addition of "*within the scope of Rule 702*" would emphasize that the new language was to "protect against evasion of the Rule 702 reliability requirements, without requiring parties to qualify as experts those witnesses who traditionally and properly have been considered as providing lay witness testimony." *Id.*

We have considered both pre-amendment and post-amendment cases and have determined that the testimony offered by Tampa Bay's employees and/or officers was of a type traditionally and properly considered lay witness testimony, as it was not based on specialized knowledge subject to Rule 702. *See United States v. Tinoco*, 304 F.3d 1088, 1090 (11th Cir. 2002) (admitting officer's testimony that boat used in smuggling was a typical go-fast boat under pre-amendment 701); *Miss. Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 362 (5th Cir. 2002) (allowing corporation's director of risk management to testify as to lost profits due to his particularized knowledge about the company's underlying

accounts).

Like the police officers in *Novaton* and *Myers* and the business owners in *Agro*, Tampa Bay's witnesses testified based upon their particularized knowledge garnered from years of experience within the field.[17]  Their testimony was helpful to the district judge and relevant to the issues presented in the case.  Further, a thorough reading of the district court's opinion reveals that he did not solely rely on any of the above witnesses' testimony in finding that the charges for the Ship's repairs were reasonable or that the time required to complete them was unreasonable.  He evaluated each and every condition report against the testimony presented as to the work done, and found that each was reasonable.

Based on the foregoing, and mindful of the level of deference with which we evaluate a district court's evidentiary rulings made during a bench trial, we find no basis for determining that the district judge abused his discretion.

AFFIRMED.

---

[17]  We find no basis to determine that *Novaton, Agro* & *Meyers*, based on their facts, require a different finding after Rule 701's amendment.