[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14514
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cr-00008-CAP-JSA-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CURTIS JONES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(September 21, 2016)

Before HULL, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Curtis Jones appeals his conviction for one count of conspiracy to distribute cocaine and one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, and his 180-month sentence. We affirm.

## I. BACKGROUND

In early January 2013, agents from the Drug Enforcement Agency ("DEA") began a wiretap investigation of a suspected cocaine trafficker, Jonathan Crutcher. On January 15, 2013, agents intercepted a call between Crutcher and another male, later identified as Curtis Jones, in which Jones advised Crutcher he had just received some drugs. Agents intercepted another call between Crutcher and Jones on January 29, 2013, in which they arranged for a drug transaction to take place later that day. The agents established surveillance on Crutcher and observed him meeting with Jones in a convenience-store-parking lot. After he met with Crutcher, the agents followed Jones to a residence located at 3964 Stonewall Tell Road in Atlanta, Georgia, and observed a number of vehicles coming and going from that residence over the course of the afternoon, including Crutcher's vehicle and a red Dodge Ram.

Based on several intercepted calls between Jones and Crutcher during that time period, the agents learned Crutcher had turned over a large sum of money to Jones. In turn, Jones provided the drug proceeds to his source of supply, whom agents believed was driving the Dodge Ram. When the Dodge Ram left the

2

Stonewall Tell Road residence, agents directed a local police officer to conduct a traffic stop of the vehicle. Three large bags of money were recovered from the vehicle, containing $614,811 in cash. The following day, January 30, 2013, agents intercepted a call between Jones and Crutcher in which Crutcher asked Jones for another four or five kilograms of cocaine. Following that call, the agents sought and obtained a wiretap for Jones's phone.

On February 16, 2013, agents intercepted a call between Jones and an unidentified male, in which they discussed a future drug transaction. Two days later, on February 18, 2013, agents intercepted several calls between Jones and a person identified as "Dee," which led them to believe the planned drug transaction would take place that day. The agents established surveillance on Jones at 2170 High View Road in Atlanta. Agents observed a number of vehicles coming and going from the High View Road residence, including a blue Chrysler Pacifica and a gray Nissan Maxima. When the Pacifica left the High View Road residence, the agents directed local law-enforcement officers to conduct a traffic stop of the vehicle. The officers recovered a one-kilogram package of powder cocaine and a bag containing crack cocaine in the backseat of the vehicle. The agents likewise directed local law enforcement to conduct a traffic stop of the Maxima, when it left the High View Road residence. The officers recovered two kilograms of cocaine

3

under the hood of the vehicle and eight kilograms of cocaine from trap compartments under the floorboards.

Following the conclusion of the wiretap investigation, DEA agents conducted a "takedown," in which they simultaneously arrested the various individuals involved in the investigation. R. at 1038. The takedown took place on January 15, 2014; DEA Special Agent Michael Connolly, the co-case agent for the investigation, was assigned arresting Jones. Special Agent Connolly arrested Jones at a Hampton Inn in East Point, Georgia. He subsequently took Jones to 515 Platoro Court, Jones's residence, because Special Agent Connolly had a seizure warrant for Jones's BMW, which was located at that address. When they arrived at Platoro Court, Special Agent Connolly advised Jones of his *Miranda*[1] rights. Jones waived his rights and gave Special Agent Connolly consent to search his Platoro Court residence.

In the family room of the residence, the agents found a home-security-system monitor, a loaded firearm, and extra magazine under the couch cushions. In one of the kitchen cabinets, the agents found a money counter. They also recovered a number of plastic baggies from the residence. In the master bedroom, agents found another security-system monitor, a collection of watches, and a collection of sneakers that Jones stated was worth approximately $10,000.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

4

Jones told Special Agent Connolly he lived at Platoro Court, and a barber and his son also had stayed there. When asked whether there were any firearms in the house, Jones stated the barber may have left a gun in the house. When Special Agent Connolly asked Jones about his involvement in narcotics trafficking, Jones admitted he was a marijuana trafficker. Jones initially denied any involvement in cocaine trafficking but later stated he could get five to ten kilograms of cocaine from "the Mexicans." R. at 1064.

Special Agent Connolly asked Jones about a house located at 1980 Childress Drive, which Jones had stated he owned. Special Agent Connolly requested permission to search that residence; Jones gave his consent. After the search at Platoro Court concluded, Special Agent Connolly drove Jones to the Childress Drive residence. On the ride there, Special Agent Connolly asked Jones whether he had a large stash of money somewhere; Jones admitted there was approximately $250,000 in the trunk of his BMW. Agents later searched the BMW and found three bags in the trunk of the car containing a total of $274,668 in cash.

At Childress Drive, Special Agent Connolly observed a security-system monitor in the living room of the residence. In the kitchen, agents discovered marijuana in the oven and in a hidden compartment behind the kick plate on the cabinets. They also found a scale in one of the cabinets and a firearm on top of one

5

of the cabinets.  In a kitchen drawer, Special Agent Connolly found a money

ledger of the type commonly seen in drug-trafficking cases.

Based on the wiretap investigation, a federal grand jury indicted Jones on

one count of conspiracy to distribute cocaine, in violation of 21 U.S.C.

§§ 841(a)(1), (b)(1)(A), 846 (Count 1), and one count of distribution of and

possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1),

(b)(1)(A) (Count 2).  Jones pled not guilty and proceeded to trial.

Prior to trial, Jones's counsel moved for a *Daubert*[2] hearing on the

admissibility of the proposed expert testimony of government witness Lieutenant

David Noe on drug trafficking.  At the hearing, Jones's counsel objected to the

proposed testimony to the extent the government sought to have Lieutenant Noe

testify a certain code referred to specific drugs.  He did not object to a general

explanation regarding the use of code words in wiretapped conversations.  The

government represented Lieutenant Noe would not interpret any of the intercepted

calls in this case, and it did not intend to ask him whether specific terms in those

calls commonly referred to a particular drug.  To the extent Jones agreed

Lieutenant Noe was going to testify only about code words generally, he had no

objection.  Based on this understanding, the magistrate judge issued an order

denying Jones's motion as moot but stating the agreed-upon limits to Lieutenant

---

[2] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1983).

Noe's testimony.  The order explained Jones's counsel's objections to Lieutenant Noe's proposed testimony and the government's representation it would not ask Lieutenant Noe about code words associated with specific drugs.  The order further required the government to provide notice before trial if it later decided to elicit such testimony from Lieutenant Noe and stated Jones could refile his *Daubert* motion at that time.

At trial, the government first called Special Agent Connolly.  In testifying about wiretap investigations generally, Special Agent Connolly stated intercepted conversations typically were in coded language.  Jones's counsel objected to Special Agent Connolly's testimony, because he had not been given notice Special Agent Connolly would be providing testimony about coded conversations.  Jones's counsel asserted he had been given notice Lieutenant Noe would be providing expert testimony on the use of coded language in intercepted calls and argued the government could not seek to present that information through a different witness without providing requisite notice.  The government contended Special Agent Connolly was not offering expert testimony; his testimony was clearly admissible as a lay opinion, because it was based on his personal experience.  The government further maintained it was not going to elicit testimony about whether specific code words referred to particular drugs.  Instead, the government represented it was offering testimony regarding the  fact drug dealers use coded language, which was

7

appropriate lay testimony.  The judge overruled the objection but granted Jones's counsel's request for a continuing objection.

Later in his testimony, when discussing the money ledger found at Childress Drive, Special Agent Connolly explained he believed the ledger was of the type commonly used by drug traffickers because "the amount 32,500 [in the ledger] was the amount of [a] wholesale kilogram of cocaine."  R. at 1082.  Jones's counsel objected based on a lack of foundation; the district judge allowed the government to lay a foundation.  Special Agent Connolly explained he knew the wholesale price of cocaine during the time frame of the investigation was $32,500 from conducting investigations and debriefing informants and defendants.  He further testified the wholesale price of marijuana at the time of the investigation was between $800 and $2,500 per pound.  On cross-examination, Special Agent Connolly was asked about his knowledge of the wholesale price of cocaine, which he stated was based on his own investigative experience in other cases during the same time period as this investigation.  Special Agent Connolly admitted he did not have any documentation showing the wholesale price of cocaine in the Atlanta area in 2013 was $32,500 and that price was never mentioned in the intercepted calls in this case.  On re-direct examination, Special Agent Connolly explained, when drug traffickers purchase cocaine at a wholesale price, they generally

8

increase the price by $1,000 to $2,000 on resale to make a profit.  In this case, the intercepted calls showed Jones was selling cocaine for approximately $34,000.

The government also presented testimony from DEA Special Agent Deverron Ramcheran, who was the lead case agent in the investigation of Jones.  During Special Agent Ramcheran's testimony, the government played a number of intercepted calls from the investigation.  In response to a question regarding the intercepted call on February 16, 2013, between Jones and an unidentified male, Special Agent Ramcheran testified he anticipated there was going to be a drug transaction, because "Mr. Jones says that he is going to be receiving another 40 kilograms of cocaine."  R. at 1285.  Jones's counsel objected to Special Agent Ramcheran's statement, because no foundation had been laid for his interpretation of the call, and the government had stated it did not intend to offer this interpretation.  The government responded it was appropriate lay-opinion testimony and contended it specifically had asked Special Agent Ramcheran to describe what investigative steps the call had caused him to take.  The district judge overruled Jones's counsel's objection.

Regarding the February 18, 2013, calls between Jones and Dee, Special Agent Ramcheran testified he believed a drug transaction was going to take place because Jones told Dee the "black ones" would be there in an hour or two.  R. at 1288.  When Special Agent Ramcheran began to explain the meaning of the phrase

"the black ones," Jones's counsel objected; the judge sustained the objection.

Special Agent Ramcheran then stated: "I knew that Mr. Jones and Dee had made

an arrangement for Dee to receive ten, because he refers to it as one zero, ten

kilograms of cocaine." R. at 1289. Jones's counsel objected and again argued the

government had stated at the *Daubert* hearing it would not elicit testimony about

specific words in the intercepted conversations referred to a particular drug. He

argued the government was doing that by having Special Agent Ramcheran testify

certain calls were discussing kilograms of cocaine, rather than stating the calls

were referring generically to a drug transaction. Jones's counsel reiterated the

interpretation of specific code words was expert testimony for which the

government was required to provide notice; consequently, the government could

not present it as a lay opinion.

The government contended Jones was misrepresenting what had occurred at

the *Daubert* hearing. The government had agreed Lieutenant Noe, the proposed

expert, would not interpret any of the calls in this case and would not give general

testimony about common code words used to refer to cocaine and marijuana. The

government further asserted it was not required to provide notice of anything other

than expert testimony and further stated it no longer intended to call Lieutenant

Noe to testify.

10

Jones's counsel reiterated his argument that, because the government had agreed not to elicit the challenged testimony concerning code words from its expert witness, it should not be able to do so through Special Agent Ramcheran. The judge said the government did not need an expert to give that sort of testimony. Based on the government's representation at the hearing, Jones's counsel asserted he reasonably had been under the impression the government was not going to elicit testimony about code words and reiterated that testimony exceeded the bounds of lay testimony.

In response, the government maintained it was appropriate for Special Agent Ramcheran to give lay testimony interpreting calls to help the jury understand the agents' reasons for conducting surveillance on a particular occasion. The judge ultimately overruled the objection; the government stated it would refrain from discussing specific code words. Jones's counsel requested and was granted a continuing objection. Following the close of the evidence, the jury found Jones guilty on both counts with which he had been charged.

Prior to sentencing, the U.S. Probation Office prepared a presentence investigation report ("PSI"). The PSI applied a base-offense level of 32; Jones also received a two-level enhancement under U.S.S.G. § 2D1.1(b)(1), because a firearm was possessed. Specifically, the probation officer noted firearms were recovered from both Platoro Court and Childress Drive. Jones's offense level was 34, and his

criminal-history category was III, which resulted in a Sentencing Guidelines range of 188 to 235 months of imprisonment.  Jones's counsel objected to the two-level-firearm enhancement and asserted neither of the firearms had been possessed during the criminal conduct.  He also objected to imposition of a criminal-history point for one of his prior crimes.

At sentencing, the judge sustained Jones's counsel's objection to the criminal-history point, reducing his criminal-history category to a II.  Concerning the firearm enhancement, Jones argued there was no evidence of drug-related activity at the Platoro Court residence.  He further contended the evidence found at the Childress Drive residence showed only the firearm found there may have been used in connection with marijuana trafficking, not with the charged cocaine crimes.  In addition, Jones asserted the record showed no one ever observed Jones with a firearm during the course of the investigation, and neither of the residences was connected to the cocaine transactions.

The government argued the firearm enhancement applied, unless it was clearly improbable the weapon was connected with the crime.  The government noted a money counter, expensive BMW, and more than a quarter-of-a-million dollars in drug proceeds were found at the Platoro Court residence and contended the firearm found at that address was there to protect the drug proceeds.  The government also asserted the firearm at Childress Drive was there to protect

12

Jones's marijuana. Based on all of the indicia of drug trafficking found at both residences, the government argued it was not clearly improbable the firearms were used in connection with the charged crimes.

Jones's counsel presented the testimony of Apollo King-el, a barber who had lived with Jones at Platoro Court during 2013 and 2014. King-el testified he owned a firearm during that period of time, but he had not seen any drug transactions take place at the Platoro Court residence. On cross-examination, King-el testified he was not living with Jones at the time of Jones's arrest. When he lived with Jones, King-el kept his firearm either in the upstairs bedroom, where he stayed, or in the laundry room. King-el did not take the firearm with him when he left Platoro Court.

Following King-el's testimony, the judge overruled Jones's counsel's objection to the firearm enhancement. The judge found both firearms, which were loaded pistols, were possessed by Jones and connected with the drug crime, because they were the type of weapons for offense or defense, rather than hunting. The firearm at Childress Drive was found in the same room, where there was obvious drug activity. Based on the reduction in his criminal-history category to II and his base- offense level of 34, the judge calculated Jones's Guidelines imprisonment range as 168 to 210 months. The judge imposed a sentence of 180 months for each count of conviction, to be served concurrently.

13

## II.  DISCUSSION

### A.    Evidentiary Rulings

On appeal, Jones argues the district judge erred in admitting some of Special Agent Connolly's testimony as lay testimony.  He asserts Special Agent Connolly's testimony regarding the interpretation of the intercepted calls, money ledger, and the wholesale prices of cocaine and marijuana was based on specialized knowledge and fell within the scope of expert, rather than lay testimony.  Jones acknowledges there was overwhelming evidence of his involvement in the drug trade but maintains he was harmed by the judge's error, because his defense at trial was he trafficked only in marijuana, not cocaine.

We ordinarily review a trial judge's evidentiary rulings for abuse of discretion.  *United States v. Frediani*, 790 F.3d 1196, 1199-1200 (11th Cir. 2015).  Even if the judge had abused his discretion, we will not reverse an erroneous evidentiary ruling unless the error was not harmless.  *Id.* at 1200.  An error is harmless unless, in light of the record as a whole, there is a reasonable likelihood the error had a substantial influence on the outcome of the proceeding.  *United States v. Bradley*, 644 F.3d 1213, 1270 (11th Cir. 2011).  If a defendant does not plainly and prominently raise an issue on appeal, we consider that issue abandoned, even if it was properly preserved at trial.  *United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).

14

When a defendant fails to preserve his challenge to an evidentiary ruling before the district judge, we review only for plain error. *United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007). Under that standard, the defendant must show (1) an error (2) that was plain and (3) affected his substantial rights. *Id.* at 1343 n.7. If those three conditions are met, then we may correct the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation and internal quotation marks omitted). An error is plain if it is clear from either the plain meaning of a statute or constitutional provision, or from a holding of the Supreme Court or this court. *United States v. Pantle*, 637 F.3d 1172, 1174-75 (11th Cir. 2011). An error affects substantial rights when it is prejudicial to the defendant, meaning the defendant must show the error affected the outcome of the trial proceedings. *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 1778 (1993).

Federal Rule of Evidence 701 permits lay witnesses to give opinion testimony if that testimony is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. We have held lay witnesses, including police officers, may offer testimony based on particularized knowledge garnered from experience in a particular field, and this testimony is not

15

"specialized knowledge" within the meaning of Rule 702.  *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1223 & n.17 (11th Cir. 2003).  *But see United States v. Tinoco*, 304 F.3d 1088, 1119-20 (11th Cir. 2002) (questioning whether an agent's testimony regarding the market value of cocaine, based wholly on past experience rather than the specific circumstances of the case, exceeded the bounds of lay testimony, but ultimately declining to resolve that issue because any error was harmless).

In addition, we have held a government agent properly may testify as a lay witness regarding his interpretation of alleged code words in intercepted telephone calls.  *United States v. Jayyousi*, 657 F.3d 1085, 1102-04 (11th Cir. 2011).  In *Jayyousi*, we explained this testimony rationally was based on the agent's perception, because it came from his review of numerous documents during the course of the investigation.  *Id.* at 1102-03.  We further held the testimony was helpful to the jury, because the agent's knowledge of the investigation allowed him to draw inferences the jury could not readily have drawn.  *Id.* at 1103.  Finally, we rejected the defendant's contention the agent's testimony was from specialized knowledge, because it was based on his experience in that particular investigation. *Id.* at 1103-04.

The district judge did not err in his evidentiary rulings.  Jones did not challenge Special Agent Ramcheran's testimony interpreting the intercepted calls

16

in his initial brief; therefore, he has abandoned that challenge on appeal, even though he preserved an objection to Special Agent Ramcheran's testimony at trial. *See Jernigan*, 341 F.3d at 1283 n.8. Furthermore, Jones's challenge to Special Agent Connolly's testimony concerning the intercepted calls, though preserved on appeal, ultimately fails. First, Special Agent Connolly did not interpret specific code words during his testimony or indicate particular calls referred to cocaine transactions. Instead, he stated as a general matter drug traffickers often use coded language in phone calls. Moreover, even if Special Agent Connolly had testified regarding the meaning of specific code words in the intercepted calls, his testimony would have been proper lay testimony under our case law.[3] *See Jayyousi*, 657 F.3d at 1102-04; *Tampa Bay Shipbuilding*, 320 F.3d at 1223.

Jones's other argument concerning the admission as lay opinions of Special Agent Connolly's testimony about the money ledger and the wholesale prices of cocaine and marijuana also fails. At trial, Jones's counsel did not object to the admission of the ledger and objected only to Special Agent Connolly's testimony concerning the wholesale price of cocaine for lack of foundation, not as improper expert testimony by a lay witness. Consequently, Jones did not preserve his

---

[3] This is equally true for Special Agent Ramcheran's testimony. Even if Jones had not abandoned his challenge to Special Agent Ramcheran's testimony on appeal, he would not have prevailed.

17

present challenge at trial; therefore, we review his challenge only for plain error. *Edouard*, 485 F.3d at 1343.

The district judge did not plainly err in admitting Special Agent Connolly's testimony, because our precedent does not demonstrate clearly that testimony fell outside the proper bounds of lay testimony.  In *Tinoco*, we stated testimony such as that given by Special Agent Connolly *might* exceed the bounds of permissible lay testimony because it was based on past experience, rather than information learned during the course of the  investigation.  *See Tinoco*, 304 F.3d at 1119-20.  We ultimately did not resolve that question in *Tinoco*, however, and our decision in *Tampa Bay Shipbuilding* could be read to support the admission of Special Agent Connolly's testimony as lay testimony, because it was based on his particularized knowledge of the drug trade garnered through his experience in the field.  *See id.*; *Tampa Bay Shipbuilding*, 320 F.3d at 1223 & n.17.  In the absence of clear precedent showing Special Agent Connolly's testimony was impermissible as a lay opinion, there was no plain error.  *Pantle*, 637 F.3d at 1174-75.

## B.     Sentencing Enhancement

Jones also contends the district judge erred in applying a two-level enhancement under U.S.S.G. § 2D1.1(b)(1), because the government did not show a nexus between the two firearms found and the charged cocaine conspiracy. Jones asserts there was no evidence any cocaine transactions took place at either

Platoro Court or Childress Drive, or that Jones was ever seen with a weapon during the course of the investigation. Jones argues the government failed to prove the firearms found at those locations were present at the site of the charged conduct.

We review a trial judge's interpretation and application of the Guidelines to the facts de novo and the judge's findings of fact for clear error. *United States v. Barrington*, 648 F.3d 1178, 1194-95 (11th Cir. 2011). A factual finding is clearly erroneous when, upon review of the evidence, we are left with a definite and firm conviction that a mistake has been made. *Id.* at 1195. Whether a firearm was possessed in connection with a crime is a factual finding we review for clear error. *United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006).

Section 2D1.1 of the Sentencing Guidelines provides a two-level increase in a defendant's base-offense level if a dangerous weapon, including a firearm, was possessed. U.S.S.G. § 2D1.1(b)(1). "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.* cmt. n.11(A). For the enhancement to apply, the government must demonstrate by a preponderance of the evidence either the firearm was present at the site of the charged conduct or the defendant possessed the firearm during conduct associated with the crime of conviction. *Stallings*, 463 F.3d at 1220. Mere possession of a firearm is not sufficient for the enhancement to apply; "the government must show that the firearm had some purpose or effect

19

with respect to the drug trafficking crime." *Id.* at 1220-21 (citation and internal quotation marks omitted).  If the government satisfies this burden, then the burden shifts to the defendant to show a connection between the firearm and the crime was clearly improbable.  *Id.* at 1220.  The proximity of a firearm to drugs and drug-related items is sufficient to satisfy the government's initial burden under § 2D1.1(b)(1).  *See United States v. Carillo-Ayala*, 713 F.3d 82, 91-92 (11th Cir. 2013).

We have upheld the application of the § 2D1.1(b)(1) enhancement where the firearm at issue was found in the same room as several drug-related objects, including a set of scales, a ziplock bag with cocaine residue, and a large amount of cash.  *United States v. Hall*, 46 F.3d 62, 63-64 (11th Cir. 1995).  The defendant in *Hall* was charged with importation of marijuana based on a wiretap investigation, however, no marijuana was found at the defendant's residence.  *See id.* at 63.  We held the district judge properly applied the firearm enhancement because "[t]he proximity of the handgun to several drug-related objects, located in the house where conversations concerning the marijuana importation occurred, sufficiently showed the handgun was possessed during the offense." *Id.* at 64.

The judge did not err in applying the § 2D1.1(b)(1) enhancement.  First, both firearms were found in close proximity to drugs or drug-related items.  *See Carillo-Ayala*, 713 F.3d at 91-92.  At Platoro Court, the firearm was found in the

same residence as a money counter, an item commonly associated with drug trafficking operations, and the BMW containing more than $270,000 in drug proceeds.  Similarly, the firearm at Childress Drive was found in the same room as a scale, marijuana, and a money ledger containing entries that referenced the wholesale price of cocaine.  Unlike *Stallings*, this is not a case in which the government is relying on the mere possession of a firearm at the defendant's residence, unconnected with any other evidence of drug-trafficking activity.  *See Stallings*, 463 F.3d at 1220-21 (noting the only evidence presented in support of the enhancement was that three firearms were found in the defendant's residence, where no activities related to the conspiracy had occurred).

Jones nevertheless protests this evidence is insufficient to provide a nexus between the firearms and cocaine trafficking, because no cocaine was found at either residence, and there was no evidence Jones conducted any cocaine transactions at those addresses.  As we held in *Hall*, it is not necessary for the firearm to be found in the same location as the charged drug for the enhancement to apply.  *See Hall*, 46 F.3d at 63-64.  Furthermore, the money ledger at Childress Drive contained entries related to cocaine transactions, showing the firearm at that address was possessed during conduct associated with the charged offenses.  *Stallings*, 463 F.3d at 1220.  In addition, the firearm at Platoro Court had the potential to facilitate the charged crime, since it could be used to protect Jones's

21

drug proceeds.  *See Carillo-Ayala*, 713 F.3d at 91-92.  Because the jury concluded Jones was involved in cocaine trafficking in addition to his admitted involvement in marijuana trafficking, it is not clearly improbable the drug proceeds found at Platoro Court came from Jones's cocaine trafficking activities.  *Stallings*, 463 F.3d at 1220.

**AFFIRMED.**