[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 23, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-12272

_____

D. C. Docket No. 07-60096-CR-WJZ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDWIN DISLA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 23, 2009)

Before CARNES and HULL, Circuit Judges, and LAWSON,[*] District Judge.

HULL, Circuit Judge:

---

[*]Honorable Hugh Lawson, United States District Judge for the Middle District of Georgia, sitting by designation.

After a jury trial, Edwin Disla appeals his three cocaine and heroin drug convictions and 365-month concurrent sentences. After review and oral argument, we affirm.

## I. PROCEDURAL HISTORY

On April 17, 2007, a federal grand jury in the Southern District of Florida issued a three-count indictment against Edwin Disla a/k/a Campeon ("Disla"), Josue Cruz ("Cruz"), and Ricardo Mejia-Martinez ("Mejia-Martinez"). Count I charged Disla, Cruz, and Mejia-Martinez with conspiracy to possess with the intent to distribute one (1) kilogram or more of heroin and five (5) kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i) and (ii), and 21 U.S.C. § 846. Count II charged Disla and Cruz with knowingly and intentionally attempting to possess with the intent to distribute five (5) kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(ii), and 18 U.S.C. § 2. Count III charged Disla and Mejia-Martinez with knowingly and intentionally attempting to possess with the intent to distribute one (1) kilogram or more of heroin and five (5) kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i) and (ii) and 18 U.S.C. § 2. The indictment also contained forfeiture allegations as to Counts I-III.

On January 22, 2008, Disla proceeded to trial with his co-defendant Mejia-

2

Martinez. At the time of trial, Cruz was still at large.

On January 31, 2008, the jury reached a verdict, finding Disla guilty on all three counts, with a special finding as to Counts I, II, and III that the cocaine weighed 5 kilograms or more, and a finding as to Counts I and III that the heroin weighed 1 kilogram or more. The jury acquitted Mejia-Martinez on all charges.

Because Disla raises several evidentiary errors and challenges certain rulings at trial, we outline the trial evidence in detail.

## II.  TRIAL EVIDENCE

### A.  Disla's Employment

Disla was initially employed with the U.S. Customs Service, and later with U.S. Customs and Border Protection ("CBP"), from 1994 to 2007. Disla worked mainly in the Miami International Airport ("MIA"), with job duties including passenger processing, baggage control, immigration checkpoint control, and making arrests. Disla wore a uniform and held a firearm and a badge.

Around May of 2006, Disla was placed on administrative duty due to allegations that he had assaulted a passenger. Disla was not fired, but his service weapon was taken away, and he no longer had law enforcement authority. Disla continued to receive pay and perform desk work. Around June of 2006, Disla stopped reporting to work and told a supervisor he suffered from anxiety and

3

depression.  After Disla stopped reporting to work, CBP considered him to be absent without leave, or AWOL, and paid him no salary.  In July 2007, Disla was suspended from his job.

## B.    Special Agent Reddin's Investigation

Special Agent John Reddin initially was employed by U.S. Customs Service, and by Immigration and Customs Enforcement (ICE) after the Department of Homeland Security was created.   Reddin is currently employed with ICE as a special agent in the Office of Professional Responsibility (OPR).  The OPR investigates criminal wrongdoing by ICE and CBP employees.

Reddin first learned of Disla's involvement in narcotics trafficking on September 15, 2006 when his office received an allegation from another ICE employee who worked in Santo Domingo, Dominican Republic.  This ICE employee stated that a source in the Dominican Republic had disclosed that Disla was importing heroin into the United States.  Reddin traveled to Santo Domingo and interviewed an individual who advised Reddin that Disla was transporting heroin through carry-on luggage from the Dominican Republic to Miami.

Reddin testified that another ICE officer learned through an investigation that in August of 2006, two confidential informants met with someone who was "recommended" by a narcotics trafficker in New York.  This person was identified

to them as "Campeon." The meeting concerned the transportation of narcotics. "Campeon" did not reveal himself to be Disla at the meeting.

After the August 2006 meeting, there were several telephone calls between the informants (a husband-and-wife team) and "Campeon." On January 20, 2007, Disla met with the two informants at a restaurant in North Miami, Florida. As a result of that meeting, law enforcement officers determined that "Campeon" was Disla, and Special Agent Reddin was brought into the investigation.

The government then set up a controlled delivery of narcotics involving Disla. After a series of recorded telephone calls between the informants and Disla, another face-to-face recorded meeting between Disla and the informants took place at a public restaurant in Hallandale, Florida on February 3, 2007. During this meeting, Disla agreed to do a test run of 10 kilograms of cocaine from Puerto Rico to Miami. It was agreed that Disla would fly to Puerto Rico, meet with an associate of the informants named "Charlie," receive the drugs from "Charlie," and transport them to Miami. "Charlie" was actually Detective Carlos Vazquez Gomez of the San Juan Police Department, working in an undercover capacity and posing as a member of a drug trafficking organization. Disla was to be paid $1,500 per kilogram, or a total of $15,000, for the transportation of the narcotics from Puerto Rico to Miami.

On February 9, 2007, Disla met with "Charlie" (i.e. Detective Vazquez) in a mall parking lot in Puerto Rico. During that recorded undercover meeting, Disla took possession of 10 kilograms of sham cocaine. Later that same day, Disla flew from San Juan International Airport to Miami. Despite the fact that Disla was no longer on active duty, Disla identified himself as an armed officer at the San Juan airport and used his CBP credentials to bypass airport security with the sham cocaine.

At approximately 10:00 p.m. at the Gulfstream racetrack in Hallendale, Florida, Disla met with the informants, delivered the 10 kilograms of sham cocaine, and accepted payment of $15,000. Law enforcement officers photocopied the serial numbers on the money for potential evidentiary purposes.

After another series of recorded telephone calls, Disla again met with the informants at a Starbucks in North Miami on March 20, 2007. During this recorded meeting, Disla discussed transporting multiple kilograms of heroin and cocaine from Puerto Rico to Miami at rates of $1,500 per kilogram of cocaine and $3,750 per kilogram of heroin.

On March 28, 2007, Disla and his co-defendant Mejia-Martinez flew from Miami to San Juan, Puerto Rico. Disla used an alias of "Francisco Rivera" for the flight and the rental car in Puerto Rico. Disla had a fake Florida driver's license

6

using the name Francisco Rivera. Upon arrival, Disla called one of the informants, who instructed Disla to travel to the Plaza Del Sol Shopping Center in Bayamon, Puerto Rico. Disla and Mejia-Martinez were picked up at the airport by another associate, who drove them to a rental car agency within the airport. There Disla rented a Toyota Corolla. The three individuals then traveled to the Carolina Plaza shopping center, where Disla purchased three suitcases.

Next, the three individuals traveled to the Plaza Del Sol Shopping Center. At the time they arrived, Disla was driving the rented Toyota Corolla while his associate was driving his Chevy pick-up. Co-defendant Mejia-Martinez was riding as a passenger in the Chevy pick-up. Detective Vazquez and another informant were already present in the parking lot in a different Toyota Corolla. When the defendants arrived, Mejia-Martinez exited the Chevy pick-up truck and entered the rented Toyota Corolla, while Disla exited that Corolla and entered the Chevy pick-up truck. Disla then entered the law enforcement Corolla and confirmed he was ready to proceed with the transaction. Co-defendant Mejia-Martinez backed up the rented Corolla next to the law enforcement Corolla. Then two additional undercover officers, posing as members of the narcotics organization, arrived in a sports utility vehicle ("SUV") and had a bag containing 20 kilograms of sham heroin and a bag containing 25 kilograms of sham cocaine. Mejia-Martinez carried

7

the bags containing sham narcotics from the SUV to the rented Corolla in two separate trips. Mejia-Martinez then began walking away toward the shopping mall. At that time, law enforcement agents arrested Disla and Mejia-Martinez. Based upon the negotiated transportation fees and the amount of narcotics involved, Disla was due to be paid $112,000 for transporting these sham drugs from San Juan to Miami.

**C.     Special Agent Alahverdian's Investigation of Disla**

Special Agent Ed Alahverdian of the DEA also testified about his investigation of Disla. Alahverdian encountered Disla in New York, New York on February 16, 2007. Alahverdian received a phone call from Ed Rapp with the Port Authority in New Jersey. Rapp informed Alahverdian that law enforcement had been following four individuals all day. Those four individuals later turned out to be Disla, Camellia Perralta, Rosario Rodriguez, and Josue Cruz.

Alahverdian was told that two of these individuals (Perralta and Cruz) were initially spotted in a New Jersey hotel because they were not acting like normal travelers, and law enforcement began to follow them at that point. Rodriguez picked up the two individuals in a Jeep, and the three of them drove from New Jersey into the Washington Heights area of Manhattan and eventually entered an apartment building on 160th Street. Disla then showed up at the same apartment

8

building.  All four individuals came out of the building and took a black livery cab a couple of blocks away to where a red Toyota was parked.  The livery cab driver parked the cab and the four individuals got into the Toyota and drove to John F. Kennedy Airport ("JFK").  At some point, Disla and Perralta split from Cruz and Rodriguez.  Disla and Perralta got onto the "AirTrain," and the agents and officers were unable to follow them further.  Officers continued to monitor the vehicle[2] the individuals had left behind in Washington Heights.

The same day (February 16, 2007), Josue Cruz and Rosario Rodriguez were interdicted around 5:30 p.m. at JFK airport with a large amount of U.S. currency in a deli bag inside their luggage.  Cruz told the officers he was trying to get a flight to Puerto Rico.  The officers asked if they could look in Cruz's bag, and they found a black plastic "New York deli bag" holding a large amount of currency.  The currency was wrapped up in black rubber bands and packaged in New York deli bags, which Alahverdian stated is a common way that drug money is packaged.  When asked where he got the money, Cruz replied that he was in a hotel in New Jersey and had left his hotel room with the door open.  Cruz came back to get his bags when a stranger in the hallway told Cruz, "I left something in the room for you."  Cruz told the officers he "didn't pay any mind to it," closed up his bags and

---

[2]Although the record is not entirely clear, it appears that this vehicle left in Washington Heights was the Jeep the four individuals had driven from New Jersey into Manhattan.

came to the airport with Rodriguez. The currency from Cruz's bag later was turned over to Alahverdian. A total of $3,000 of the seized currency matched the serial numbers of the money provided Disla at the first controlled delivery on February 9, 2007 in Miami.

After that seizure, Agent Alahverdian and his partner went to Washington Heights to assist with the investigation and discovered that Disla and Perralta had returned to the apartment building on 160th Street. When Alahverdian got to that location, he spoke with the officers there and then spoke with Perralta, who was inside a vehicle. Perralta told Alahverdian that he was traveling and that Disla had given him the bags he was carrying. After Perralta consented to a search of his bags, Alahverdian found in them women's clothing, a heat sealing machine, and heat sealing bags. Alahverdian testified that narcotics traffickers usually package narcotics or narcotics proceeds in heat sealed bags to protect against dogs detecting the drugs.

Perralta admitted to Alahverdian that he was in the apartment on 160th street earlier in the day with several people, including Disla. Perralta saw Disla in the apartment with a large amount of currency, and Disla divided up the money between Cruz and Rodriguez.

Alahverdian then approached Disla, who was also on the scene, and

conducted a pat down search of Disla that led to the discovery of Disla's CBP

badge. Disla told him he was a CBP inspector. A consent search of Disla's bag

led to the discovery of approximately six cellular telephones, a black deli bag

containing $8,000 wrapped with black rubber bands, a satellite phone, and "SIM"

memory cards, which are used in cellular telephones. Disla acknowledged he was

on unpaid leave from CBP at the time, and when asked where he got the money

from, he stated "I'm doing a couple of things." Disla stated that he was visiting a

relative in the apartment building on 160th street in New York earlier in the day.

The multiple cell phones, multiple "SIM cards," satellite phone, and the

money rubber-banded and packaged in a deli bag indicated to Alahverdian that

Disla was involved with drugs. Alahverdian testified that "narcotics traffickers

like to switch out phones," and the SIM cards allow them to change the number on

the phone they are using to avoid detection.

Law enforcement agents then went to the apartment on 160th Street where

Disla was earlier, searched the premises with the consent of the individuals inside

the apartment, and found a Glock firearm, approximately 30 rounds of

ammunition, additional magazines for the firearm, and a safe.

Alahverdian later brought Disla to the apartment on 160th Street. Disla

admitted that the Glock handgun was his, that he had driven the safe up from

Florida, and that it might contain guns and money. Disla was taken into custody and processed, but prosecution was deferred by the United States Attorney's Office for the Eastern District of New York due to the open OPR investigation in Miami. Disla was released.

A few days later, Alahverdian searched the safe, pursuant to a federal search warrant and recovered four handguns, ammunition, magazines, "drug ledgers," deposit slips, and a deli bag and a heat-sealed bag containing $27,000 wrapped in black rubber bands. The serial numbers on $1,000 worth of currency in the safe matched the recorded serial numbers of money given to Disla during the first controlled delivery on February 9, 2007 in Miami. Based on Alahverdian's experience, the paper in the safe, which he referred to as "drug ledgers," "indicated the movement of money and narcotics." Alahverdian had seen similar records in past drug investigations.

The safe also contained receipts for about $24,000 worth of bank deposits. Three of the deposits were for $5,000, and one of the deposits was for $9,000. The deposits were made at two different banks. Alahverdian testified that the amounts of money on the slips and the receipts showing the movement of money among banks indicated that the deposits had been "structur[ed]" so as to prevent the bank from notifying the government of the transactions.

Alahverdian also testified as to the prices of drugs in various locations based on his prior investigations and information received through "intelligence centers." He described how drug prices increase as they are transferred through different locations.

**D.      Disla's Proffer Meetings with the Government**

As discussed later, Disla testified and called several witnesses in his defense. As a result, in its rebuttal case the government presented evidence about two proffer meetings between Disla and the government on May 22, 2007 and on June 21, 2007. A government agent, present during these meetings, testified that Disla told the government about various instances in which he transported narcotics. In October of 2006, Disla transported ten kilograms of cocaine as a "test run" for an individual named "Santi" from Puerto Rico to New York and received $2,500 per kilogram of cocaine. After that test run, Disla and an associate, Darnel Clash, chartered an airplane to transport 80 kilograms of cocaine to Fort Lauderdale. Clash retained 10 kilograms as payment for himself, and Disla and Cruz then flew to New York and delivered the remaining 70 kilograms to Mitch. Disla was paid $2,250 per kilogram of cocaine by Mitch, and he in turn paid Cruz $15,000.

Disla and Clash then chartered another private jet and traveled to San Juan, Puerto Rico, where they met with Cruz, who had between 95 and 100 kilograms of

cocaine. They transported the cocaine to New York. On another occasion, Disla flew a chartered jet to Puerto Rico and obtained 13 kilograms of heroin and transported it to New York. Disla was paid $6,500 per kilogram of heroin. Disla also put a woman named "Heidi" in touch with a man named "Biggs" in order to assist her in transporting cocaine from Haiti to Fort Lauderdale. Through this connection, 100 kilograms of cocaine were smuggled into Fort Lauderdale and Disla received a $25,000 commission fee.

The government had already introduced documentary evidence earlier that Disla chartered private jets on five occasions between December of 2006 and February 2007. The documents showed that on each occasion, the charter jets were scheduled to fly a round trip first from Fort Lauderdale to San Juan, and then to fly a second round trip from Fort Lauderdale to either Long Island or New Jersey.

The government had introduced Disla's travel records for January 1, 2005 through 2007. In 2005, Disla made five round trips from Miami to the Dominican Republic, most of which were for one night. In 2006, Disla made approximately six trips, five to the Dominican Republic and one to Canada. Agent Reddin testified that (1) a trip for a one-night duration normally alerted law enforcement to suspicious activity; (2) the Dominican Republic is a popular transport point for

14

narcotics into the United States; and (3) Disla's one-night trips indicated that Disla was involved in smuggling heroin.

**E.      Disla's Objections to Agents Reddin and Alahverdian's Testimony**

During the trial, Disla objected to much of the testimony of Agents Reddin and Alahverdian, and on appeal Disla contends that several of the district court's evidentiary rulings were in error.  Disla objected to Reddin's testimony regarding the information Reddin learned from other officers' investigations and tips received from informants.   The district court overruled these objections and allowed Reddin's testimony in order to explain Reddin's actions in the case and his state of mind.  The district court provided a cautionary instruction to the jury with respect to Reddin's testimony that they must not consider information Reddin gained from other agents and informants for the truthfulness of the information, but only to show Reddin's state of mind as to what he did after receiving it.

Disla also objected on the basis of relevance to Reddin's testimony as to the fact that the Dominican Republic is a common transport point for narcotics into the United States, and how narcotics are transported into the United States.  The district court overruled these objections, stating that "the witness can testify based on his experience in these matters."  Disla also objected to Reddin's testimony about various other aspects of the drug trade, including how individuals are paid to

15

transport drugs, what factors influence the price of transporting drugs, the price of cocaine in the Dominican Republic and New York, and the use of codes by drug dealers in their telephone conversations. Disla contended that Reddin was not an expert in the drug trade and was not listed as an expert witness, and his testimony was improper. The district court overruled these objections.

Disla similarly objected to much of Alahverdian's testimony regarding information he had received from other investigators and from Disla's associates. The district court gave the jury a second cautionary instruction, similar to the earlier one, that "[w]ith respect to anything said to this witness [Alahverdian] you may consider it not for its truthfulness, not for the truthfulness of anything that was said to the witness, but to show what the witness did after receiving this information."

Finally, Disla first objected and then moved for a mistrial due to Alahverdian's testimony that the evidence in the safe indicated that Disla had engaged in money laundering. Disla's attorney argued that the testimony was inadmissible under Federal Rule of Evidence 404(b). The court overruled the objection and denied Disla's motion for a mistrial.

## F. Disla's Entrapment Defense

At trial, Disla also advanced an entrapment defense and sought to put up

evidence that the government entrapped him in order to retaliate against him for racial discrimination complaints that Disla had made against CBP. The government moved at trial to exclude evidence related to retaliatory discrimination. The district court initially sustained the government's objection and prohibited Disla from presenting evidence regarding alleged retaliation by the government. Several witnesses testified on Disla's behalf, but much of their testimony as to discrimination and retaliation was excluded through government objections. While the district court later revised that ruling and admitted evidence of alleged discrimination and retaliation against Disla, the following colloquy took place before that revised ruling.

## G.    Colloquy Before Disla's Testimony

Just before Disla began to testify, the court called a five-minute recess in order to discuss matters with counsel outside the presence of the jury as follows:

> THE COURT:    All right. Mr. Disla, if you will step up to the podium, please.
>         Well, hold on for just a minute. Let's do this. You wanted to take up a matter?
>
> MR. PIZZI:[3]    I do.
>
> THE COURT:    Members of the jury, before we proceed let me ask you to return to the jury room, remain in the jury room, do not discuss this matter amongst yourselves. We will be in recess for less than five

---

[3]Michael Pizzi was Disla's defense counsel.

17

minutes.  Let me take up this matter and then I will bring you back in.

Disla's defense counsel then told the court that, since the defense was not permitted to put on evidence of retaliation in connection with the entrapment defense, "I would like the opportunity to meet with Mr. Disla and go over some of the issues in his testimony so as not to run afoul of the court's ruling."  The following exchange ensued:

> THE COURT:    I do not think you will do that.  You will not do that intentionally, and if the government has an objection to a question they will stand and state it.
>
> MR PIZZI:    Okay, Your Honor.
>
> THE COURT:    All right.  Bring in the jury.

When the jury returned, Pizzi called Disla to the stand and Disla testified as to a variety of preliminary matters concerning his educational background, family background, and his training in law enforcement.  Disla also testified that he met an individual named "Mitch" in June 2006 while he was on administrative leave in New York and that Mitch asked Disla to meet with two of his friends in the import / export business in Miami to help them with the process of importing and exporting.  In Miami in August of 2006, Disla met a man and a woman (with a young child) at a Starbuck's who told him that they were from Colombia and had affiliations with people who would be importing cargo from Colombia.  At that

18

point, court was adjourned for the day and was scheduled to resume the following morning.

The next morning, the district court revised its earlier ruling in part and allowed Disla to testify as to his allegations of discrimination and retaliation, subject to the government's objections. Disla then testified in detail about the discrimination and retaliation he had experienced. While working at CBP in May of 2006, Disla was accused of striking a detained passenger and placed on administrative duty. Disla testified that his supervisor, Jan Jarrett, contacted the officers in Reddin's group to investigate him for the battery incident.

Disla testified that he believed he was put on administrative leave in May of 2006 partially due to his race and ethnicity. According to Disla, Jarrett directly made racial comments to him on four separate occasions. The district court sustained the government's hearsay objections to Disla's testimony as to what those exact comments were. Disla also testified that various previous disciplinary allegations were made against him in his job that were retaliatory and racially discriminatory. Disla contacted the Equal Employment Opportunity Commission ("EEOC") about the discrimination in May of 2006, although he did not file a formal complaint at that time.

Disla stated that after the passenger assault incident, he requested to go on

leave from his position at CBP in May of 2006 because he felt traumatized and embarrassed. He began seeing Dr. Carmen Zayas-Bazan for psychological treatment. According to Disla, both he and Dr. Zayas-Bazan requested that he be given some form of paid leave, and those requests were denied by CBP. Disla testified that his former attorney, Mark Conrad, also drafted letters to CBP on Disla's behalf asking that he be allowed to return to work, to which the CBP did not respond.

Disla further testified that he traveled to the Dominican Republic several times to visit his family and deal with family matters. Disla denied that he took these trips to conduct drug deals. Disla further testified that he did not conduct any drug deals in the Dominican Republic in 2006. On one of these trips in June of 2006, when he returned to Miami, Disla was searched in the airport upon his return for contraband, which humiliated him. Disla stated that in July of 2006, he was cleared of any wrongdoing in connection with the assault incident.

Disla testified that he returned to his office in September of 2006 and asked why he was not being allowed to return to work. Jarrett instructed another CBP supervisor, Linda Smith, to tell Disla to leave the building and tell him that he was not allowed to return. Disla testified that he filed an EEOC discrimination and harassment claim against CBP on September 6, 2006. A copy of Disla's initial

20

EEOC complaint for discrimination and harassment was admitted into evidence.

Disla believed that CBP, ICE, and OPR sought to frame him for the narcotics conspiracy due to the fact that he filed an EEOC complaint. According to Disla, the passenger assault incident was investigated by the same internal affairs group that later investigated him for narcotics trafficking, and that Reddin was working for internal affairs of U.S. Customs during the time that Disla was being investigated for the alleged battery incident.

As for his transportation of narcotics, Disla stated that in his first meeting with the informants in August of 2006, they offered to pay him $5,000 to help them smuggle drugs into the United States, and he refused. Disla claimed the informants called him about a week later and offered him $8,000 to help them import drugs. According to Disla, in early 2007, he was also threatened by Mitch in connection with an outstanding loan that Mitch had made to Disla of approximately $8,000. Disla claimed that he understood from Mitch that Disla owed the money to a drug organization affiliated with the informants. Following numerous additional phone calls with the informants, Disla agreed to meet the informants again and traveled to Puerto Rico to transport 10 kilograms of sham cocaine to Miami. Disla claimed that he then wanted nothing further to do with the informants, but he was repeatedly solicited by the informants and was contacted

21

between 10 and 15 times by the informants to conduct another narcotics transaction. Disla went to Puerto Rico for the second transaction because he felt threatened. He further testified that his driver's license was suspended because he had been unable to pay child support, and denied that he obtained a driver's license in another name so that he could do drug deals.

## H. District Court Further Revises Ruling as to Retaliation Evidence

During a break in Disla's testimony, the district court revised its prior ruling further to allow Disla to introduce additional evidence of discrimination and retaliation. The court ruled that Disla could recall some of the witnesses who had already testified.

Disla then recalled several witnesses. Dr. Carmen Zayas-Bazan, Disla's psychologist during 2005 and 2006, testified that Disla came to her for psychological treatment and that she wrote three letters to CBP in June, July, and October of 2006 requesting that Disla be put on medical leave. She received no response.

The defense also called witness Linda Smith, a supervisory officer with the CBP. Smith encountered Disla at the Miami airport in September of 2006 when he attempted to return to work. Smith informed Disla that CBP had been trying to reach him since he had been absent from work on June 11, 2006. Disla advised

Smith that he was going to return to work in two days, on September 18, 2006 and that he would provide a telephone number at that time. Smith told Disla to report to Marie Otara, a supervisor at CBP.

At the direction of Jarrett, Smith informed Disla that he was required to leave the Miami airport. During Smith's testimony, the district court sustained the government's hearsay objections as to what exactly Jarrett said to Smith when Disla showed up for work.

Carol Gladden, one of Disla's immediate supervisors at CBP, was also called by the defense to testify. Gladden had no problems with Disla. Defense counsel asked Gladden whether Jarrett ever asked Gladden to "provide extra scrutiny of Mr. Disla." The district court sustained the government's hearsay objection to this testimony.

The defense also called witness Mark Conrad, who was Disla's former attorney while Disla was on administrative duty, and who helped Disla file discrimination complaints with the EEOC. Conrad's initial testimony, given prior to the court's ruling allowing evidence of retaliation, was almost entirely disallowed by the government's objections on the basis of relevance. After Disla testified, Disla's attorney informed the court that he was unable to recall Mark Conrad to the stand because Conrad was unavailable, as he had left town to litigate

23

a trial. Later, after all of the other defense witnesses were called, Disla's counsel again explained to the court that Conrad was not available. Disla's counsel requested that he be allowed to make a phone call to Conrad. The district court stated that it would not grant a continuance to allow the defense to obtain Conrad's testimony.

After the jury convicted him, Disla timely appealed.

## III. DISCUSSION

As to his drug convictions, Disla raises several issues on appeal. First, he claims that the district court committed these errors at trial: (1) the district court prohibited the introduction of evidence of the government's alleged bias and retaliatory motive in connection with Disla's entrapment defense, specifically the racial comments Jarrett made to Disla, the statements Jarrett made to Smith about Disla, and Gladden's testimony about Jarrett's treatment of Disla; (2) the district court denied Disla the opportunity to consult with his attorney just prior to taking the stand and testifying; and (3) the district court denied Disla a continuance to procure witness Mark Conrad, which resulted in substantial prejudice and requires reversal of the convictions.

Second, Disla argues that the district court's errors cumulatively require a new trial, even if none of them, individually, are prejudicial enough to warrant a

new trial. He cites several evidentiary errors in addition to those already listed above: (1) the district court overruling Disla's objection to the prosecutor's question, while Disla was being cross-examined, whether, during the alleged assault incident, Disla called the passenger a "fucken fagot [sic]";[4] (2) the admission of testimony by Agent Alahverdian that Disla's conduct was consistent with typical drug transactions and money laundering activity, which Disla contends was improper under Federal Rules of Evidence 404(b) and 701; (3) the admission of Agent Reddin's testimony as to prices of narcotics in different localities, the role of various countries in the smuggling of narcotics into the United States, how drug couriers are paid, whether Disla's actions were consistent with other drug dealings, and how drug couriers transport narcotics into the United States, which Disla contends was improper under Federal Rule of Evidence 701; and (4) the introduction of a "plethora" of hearsay evidence in the testimony of Reddin and Alahverdian, which violated the confrontation clause of the Sixth Amendment under Crawford v. Washington, 541 U.S. 36 (2004).

After careful review of the entire record in this case, reading the parties' briefs, and having the benefit of oral argument, we conclude that all of Disla's claims of error lack merit. As recounted above, the district court adequately

---

[4]In response to the prosecutor's question, Disla testified, "That's not true," at which point his counsel objected to the question.

allowed Disla to present evidence of the government's alleged bias and retaliatory motive in connection with his entrapment defense. Disla has not shown that the district court abused its broad discretion in any of the evidentiary rulings as to that evidence.

In addition, we conclude that the district court properly admitted, under Federal Rule of Evidence 701, the testimony of Agent Reddin as to the prices of narcotics in different locations, the role of various countries in the smuggling of narcotics into the United States, how drug couriers are paid, whether Disla's actions were consistent with other drug dealings, and how drug couriers transport narcotics into the United States. This testimony was based on his experience as an investigator of narcotics trafficking and was not scientific, technical or specialized knowledge covered under Federal Rule of Civil Procedure 702. See Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., 320 F.3d 1213, 1222-23 (11th Cir. 2003). For the same reasons, Agent Alahverdian's testimony as to money laundering and the use of "drug ledgers" is admissible under Rule 701. Moreover, Agent Alahverdian's opinion that, based on his observations, Disla was engaged in money laundering was not improper Rule 404(b) evidence. United States v. Baker, 432 F.3d 1189, 1209 (11th Cir. 2005) (concluding that where the prior act is "so closely related" to the crime at issue in the case that "it must be considered

26

'inextricably intertwined' with the evidence of" the case, it is not Rule 404(b) evidence).

As to the testimony of Agents Reddin and Alahverdian about information they received from other sources in the course of their investigation, the district court properly concluded that such testimony was not hearsay because it was admitted only to explain the agents' state of mind and what they did after receiving the information. See United States v. Jiminez, 564 F.3d 1280, 1288 (11th Cir. 2009) ("[S]tatements by out of court witnesses to law enforcement officials may be admitted as non-hearsay if they are relevant to explain the course of the officials' subsequent investigative actions, and the probative value of the evidence's non-hearsay purpose is not substantially outweighed by the danger of unfair prejudice caused by the impermissible hearsay use of the statement.") (quotation marks omitted). Given the district court's cautionary instructions, there was little danger of unfair prejudice to Disla from the admission of this testimony. As it was non-hearsay, this testimony did not violate Disla's Sixth Amendment rights. See id. at 1286 ("[T]he Confrontation Clause prohibits only statements that constitute impermissible hearsay.").

We also conclude that the district court did not err by denying Disla's request for a continuance to call Mark Conrad as a witness, as Disla did not show

that Conrad would be available to testify within a reasonable period of time, and Disla's proffer to the court as to Conrad's testimony demonstrated that it would have been cumulative of the other evidence presented at trial and of marginal benefit to Disla's defense. See United States v. Cross, 928 F.2d 1030, 1048-49 (11th Cir. 1991). Nor did the court err in overruling Disla's objection to the prosecutor's questioning whether, during the alleged assault incident, Disla called the passenger a "fucken fagot," as Disla has not shown that its probative value in establishing why Disla was placed on administrative duty was substantially outweighed by its prejudicial effect. See Fed. R. Evid. 403. On direct examination, Disla claimed that he was placed on administrative leave because of discrimination. Thus, it was relevant for the government to question Disla about the passenger incident, as the government claimed that was the real basis for his being placed on administrative leave.

Only Disla's allegation that he was denied the right to counsel during trial warrants full discussion.[5]

## A. Sixth Amendment Right to Counsel

Disla alleges the district court denied his attorney's request to consult with Disla just prior to his direct testimony in violation of Disla's Sixth Amendment

---

[5]Because we find that Disla has failed to demonstrate any individual error, no cumulative error exists. See United States. v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004).

28

right to counsel. Generally, we review claims of constitutional error de novo. United States v. Williams, 527 F.3d 1235, 1239 (11th Cir. 2008). Because Disla did not offer any contemporaneous objection during trial as to the alleged denial of counsel's request to consult with him, we review his claim for plain error only. See United States v. Munoz, 430 F.3d 1357, 1375 (11th Cir. 2005). To establish plain error, a defendant must show (1) error, (2) that is plain, and (3) that affects his substantial rights. Williams, 527 F.3d at 1240. If those three conditions are met, a court may exercise its discretion to notice a forfeited error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id.[6]

"[T]he right to be represented by counsel is among the most fundamental of rights." Penson v. Ohio, 488 U.S. 75, 84, 109 S. Ct. 346, 352 (1988). "[A] trial is unfair if the accused is denied counsel at a critical stage of his trial." Id. at 88, 109 S. Ct. at 354 (quotation marks omitted).

As to counsel's consultation with his client during a trial recess, the Supreme Court has concluded that a court's order preventing a defendant from consulting with his attorney "about anything" during a 17-hour overnight recess between

_____

[6]We note that Disla did raise an argument regarding his right to consult with counsel in a motion for a new trial filed with the district court. However, because Disla did not raise his argument in a contemporaneous objection to the district court, plain error review is appropriate.

29

direct testimony and cross-examination violated the defendant's Sixth Amendment right to counsel. Geders v. United States, 425 U.S. 80, 91, 96 S. Ct. 1330, 1337 (1976). The Court in Geders specifically noted the issue of whether a prohibition on consultation during a "brief routine recess during the trial day" was not before the Court at that time. Id. at 89 n.2, 96 S. Ct. at 1336 n.2.

Later, in Perry v. Leeke, 488 U.S. 272, 109 S. Ct. 594 (1989), the Supreme Court held that there is no Sixth Amendment right to consult with an attorney during a 15-minute recess in the middle of the defendant's cross-examination. Id. at 283-85, 109 S. Ct. at 601-602. The Supreme Court noted that a defendant has "an absolute right to such consultation before he begins to testify, but neither he nor his lawyer has a right to have the testimony interrupted in order to give him the benefit of counsel's advice." Id. at 281, 109 S. Ct. at 600. There is also no Sixth Amendment right to interrupt a bench conference in order to allow the defendant to consult with his attorney. United States v. Vasquez, 732 F.2d 846, 847 (11th Cir. 1984). The Vasquez Court noted that the district court in that case did not deny the defendant a "reasonable opportunity to consult with his attorney," in part because his attorney was allowed to speak with the defendant following the conference and before the defendant's cross-examination. Id. at 848.

In addition, "a defendant or the defendant's counsel must indicate, on the

30

record, a desire to confer in order to preserve a deprivation of assistance of counsel claim," and, where a court prohibits consultation with an attorney, the defendant must show "that the prohibition actually prevented the opportunity to confer with counsel." Crutchfield v. Wainwright, 803 F.2d 1103, 1109-10 (11th Cir. 1986) (en banc) (Hatchett, J., plurality opinion). In Crutchfield, this Court concluded that there was no deprivation of the right to counsel because "the record in this case does not reflect a desire to consult or an objection to the trial court's admonition." Id. at 1111 (emphasis added).[7]

---

[7]In Crutchfield, the trial court called a brief recess in the middle of the defendant's testimony and directed the defendant's counsel not to discuss his testimony with him during the break. 803 F.2d 1103 at 1104 (Hatchett, J. plurality opinion). His attorneys did not object, move for a mistrial, or ask to discuss any non-testimonial aspects of the case with the defendant. Id. at 1104.

The plurality opinion in Crutchfield stated that if the record had reflected the defendant's desire to consult with counsel, the trial judge's prohibition on consultation during the recess would have automatically constituted reversible error. Id. at 1109. Five concurring judges agreed with the plurality opinion that the defendant was not denied the assistance of counsel under the circumstances, namely because the recess was "relatively short," the admonition from the trial court was limited to the discussion of the defendant's testimony, and neither the defendant nor his counsel objected. Id. at 1116 (Tjoflat, J., concurring). One additional concurring judge, writing separately, also agreed that because the record did not show that defendant and his counsel had any actual desire to confer during the recess, there was no deprivation of defendant's right to counsel. Id. at 1119-20 (Edmondson, J., concurring). All six concurring judges disagreed with the plurality's conclusion that, had the defendant expressed a desire to consult with his attorney, the trial court's prohibition would have been an automatic violation of the Sixth Amendment, thus dividing the court evenly as to this issue. Id. at 1115-21 (Tjoflat, J. and Edmondson, J., concurring).

Disla cites Bova v. Dugger, 858 F.2d 1539, 1540 (11th Cir. 1988) (concluding right to counsel violated where court prohibited counsel from consulting with his attorney during a fifteen-minute recess in the middle of defendant's cross-examination). The holding of Bova was limited by the Supreme Court's later decision in Perry v. Leeke, 488 U.S. 272, 109 S. Ct. 594 (1989) (holding no Sixth Amendment right to consult with attorney during a 15-minute recess in the middle of cross-examination).

31

Similar to <u>Crutchfield</u>, the record in Disla's case does not reflect that the court actually prohibited counsel from consulting with Disla. Disla's attorney stated that he would like a chance "to meet with Mr. Disla and go over some of the issues in his testimony <u>so as not to run afoul of the court's ruling</u>" (emphasis added) that it would not allow the defense to present evidence of the government's retaliatory motive. The district court stated, in response, "I do not think you will do that. You will not do that intentionally, and if the government has an objection to a question they will stand and state it." At that point, Disla's attorney did not express any desire to consult with his client as to whether Disla should testify or the subject matter of Disla's testimony. There was no indication made to the district court that Disla desired to consult with his attorney about whether he should in fact testify, or that Disla and his attorney had any concerns other than running afoul of the court's earlier evidentiary rulings. And the court assured Disla's counsel that it did not believe the defendant would run afoul of that ruling and the court could address any timely objections by the government.

Under these circumstances, and given the limited nature of Disla's counsel's request, Disla has failed to show that the court's statements actually prohibited him from consulting with his attorney about his defense, let alone that the district court committed any plain error by doing so or that his substantial rights were thereby

32

affected. In any event, we cannot say that the district court plainly violated Disla's

right to counsel during this particular five-minute recess. See Perry, 488 U.S. at

280-85, 109 S. Ct. at 600-602; Crutchfield, 803 F.2d at 1109-10. Indeed, Disla had

a full opportunity to consult with his attorney at the close of the trial day prior to

resuming the stand the following morning. And he had additional opportunities to

consult with his attorney prior to concluding his testimony the following day.

## IV. SENTENCING

On appeal, Disla also argues his three 365-month concurrent sentences are

substantively unreasonable. We review the PSI and the sentencing hearing and

then address Disla's arguments.

## A. PSI and Sentencing

The Probation Officer prepared a Pre-Sentence Investigation report ("PSI")

which attributed to Disla 25 kilograms of cocaine and 20 kilograms of heroin.[8]

Based on these drug quantities, the PSI calculated Disla's base offense level as 36

pursuant to USSG § 2D1.1(a)(3) (2007). The PSI recommended a two-level

enhancement for Disla's role in the offense as an organizer, leader, manager, or

---

[8]The PSI based its calculations of the base offense level on the amount of sham cocaine and heroin transferred to Disla's rental car during the second drug transaction on March 28, 2007 and did not take into account the 10 kilograms of sham cocaine transferred on February 9, 2007. However, adding the drug quantity from the February 9, 2007 transaction does not change Disla's base offense level calculation.

supervisor pursuant to USSG § 3B1.1(c). Given Disla's use of his CBP credentials to bypass airport security, the PSI recommended an additional two-level enhancement for the abuse of a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense, pursuant to USSG § 3B1.3. The PSI calculated Disla's total offense level as 40, which with his criminal history category of I, yielded a sentencing range of 292-365 months' imprisonment.[9]

In written objections, Disla objected to: (1) the drug quantities in the PSI; (2) the enhancements for his role in the offense and the abuse of trust; and (3) the lack of a "safety valve" recommendation pursuant to USSG § 5C1.2.[10] As to drug quantities, Disla argued that he never possessed any real drugs, that the government controlled the quantity and price of drugs transported during the investigation, and that the government "inflate[d]" the penalties by waiting to arrest him until after the second controlled delivery. Disla contended that he "did not and was not capable of providing any amount of drugs."

---

[9]The PSI also recommended that a two-level enhancement for obstruction of justice was warranted pursuant to USSG § 3C1.1, given that during trial, Disla denied seven prior narcotics shipments to which he admitted during the two proffer meetings. The PSI deferred the application of this adjustment to the district court. At sentencing, the district court denied the government's request for the obstruction of justice enhancement. Thus, we need not discuss it further.

[10]Disla also objected to the facts in the PSI, but withdrew this objection at the sentencing hearing.

Disla also filed a motion for a downward departure based on the following: (1) pursuant to USSG § 5K2.13, his "diminished capacity" as outlined by the trial testimony of Dr. Zayas-Bazan and in the PSI; and (2) the alleged "sentencing manipulation" that occurred when the government waited to arrest Disla until after the second controlled shipment, which involved a greater quantity of narcotics than the first. In support of his sentencing manipulation argument, Disla repeated the arguments made in connection with his drug quantity objection and contended that the government controlled the price and terms of the controlled transactions.

In Disla's pleadings and at the sentencing hearing, the overarching thrust of Disla's arguments in support of his objections, his request for safety-valve relief, and his motion for a downward departure was that the government had total control over the reverse-sting operation, setting the terms and providing the money and the drugs, and Disla merely transported the drugs as dictated by the government. As such, Disla argued that the government engaged in sentencing manipulation and that this was a case of "piling on by the government." Disla argued that either the sentencing manipulation or his depression, or a combination of both, warranted a downward departure. Disla also argued that these same factors should be considered by the court in imposing a reasonable sentence.

The district court overruled Disla's objections to the PSI. As to the role

35

enhancement, the court found that Disla was a supervisor in the criminal activity, supervising Mejia-Martinez, Cruz, and other individuals. The district court also found that Disla abused his position of trust as a CBP agent because he used his credentials to go through airport security without being searched and therefore used his position of public trust to contribute in a significant way to facilitating the commission or a concealment of a crime. The court also noted that border protection "is one of the first lines of defense" in ensuring that the borders are secured from individuals wishing to do harm to the country, and, for that reason, "it is certainly a position of trust that Mr. Disla held and to say he abused it is simply an understatement."

The district court also overruled Disla's objection to the drug quantities attributed to him. The district court adopted the facts in the PSI that Disla agreed to transport 25 kilograms of cocaine and 20 kilograms of heroin into the United States, set the price for smuggling the drugs, agreed to do a test run with 10 kilograms of cocaine, was aware of the drug quantities he would be smuggling, and did in fact transport the sham cocaine and sham heroin. Finally, the district court found that Disla was not entitled to safety valve relief under § 5C1.2 given its findings outlined above.

The district court denied Disla's motion for a downward departure. The

district court rejected Disla's claim of sentencing manipulation and found Disla failed to establish that he suffered from a diminished capacity as defined by § 5K2.13. The court found that despite his mental health difficulties, Disla appreciated the illegality of his conduct and retained the ability to control his conduct, as the trial evidence showed that he "managed to coordinate a sophisticated drug deal."

The court adopted the PSI's calculations of an advisory guidelines range of 292 to 365 months' imprisonment. Prior to sentencing Disla, the court received arguments from both Disla and the government as to the appropriate sentence within the guideline range. The government requested a sentence of 360 months' imprisonment based on his failure to accept responsibility and his "efforts to mislead the jury and the court" during his testimony. Disla argued that he should receive a sentence in the low end of the advisory range because: (1) he was a first offender with no history of substance abuse or violence; (2) he was not a threat to the community; (3) he was caught up in a government sting; (4) he was only a transporter rather than a manufacturer or purchaser of drugs; (5) he was trying to get his job back at the time of the controlled deliveries; (6) he was a good employee and co-worker; (7) he had a young son to support; and (8) he was sorry for his offenses.

The court sentenced Disla to 365 months as to each of Counts I, II, and III, to be served concurrently. The court stated that it had "considered the statements of all parties, the revised presentence report which contains the advisory guideline computation and range," as well as "all of the statutory factors," and that "[t]he sentence imposed reflects the seriousness of the offense, promotes respect for the law, provides just punishment, protects the public from further crimes by Mr. Disla, and hopefully affords adequate deterrence . . . ."

## B. Substantive Reasonableness of the Sentence

On appeal, Disla argues that his sentence is substantively unreasonable given the nature and circumstances of the offense. He contends that a sentence of less than 365 months would have been sufficient, but not greater than necessary, to meet the purposes of 18 U.S.C. § 3553(a). Disla argues that he should have a lower sentence because: (1) he cooperated with the government in the proffer meetings; (2) he was the victim of sentencing manipulation in that the government did not arrest him after the first controlled buy; (3) Disla is relatively young and is the father of a child; (4) his work history reflects that he was a "good employee" and he attempted to return to work despite "the government's discriminatory retaliation"; and (5) he has a history of depression and other mental illness.

We review the reasonableness of a sentence for abuse of discretion using a

two-step process. United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008). We look first at whether the district court committed any significant procedural error and then at whether the sentence is substantively reasonable under the totality of the circumstances. Id.

The party challenging the sentence bears the burden to show it is unreasonable in light of the record and the factors laid out in 18 U.S.C. § 3553(a). United States v. Thomas, 446 F.3d 1348, 1351 (11th Cir. 2006). The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. 18 U.S.C. § 3553(a). Under § 3553(a), the district court must impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in § 3553(a)(2).

When the district court considers the factors of § 3553(a), it need not discuss

all of them or state on the record that it has explicitly considered each factor. United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005). "An acknowledgment by the district court that it has considered the defendant's arguments and the factors in section 3553(a) is sufficient under Booker." Id.

In addition, "[r]eview for reasonableness is deferential. We must evaluate whether the sentence imposed by the district court fails to achieve the purposes of sentencing as stated in Section 3553(a)." Id. at 788. "There is a range of reasonable sentences from which the district court may choose." United States v. Martin, 455 F.3d 1227, 1237 (11th Cir. 2006) (quotation marks omitted). We ordinarily expect that a sentence within the advisory guidelines range will be reasonable. United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008). We will remand for resentencing "if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Pugh, 515 F.3d at 1191 (quotation marks omitted).

Reviewing the substantive reasonableness of Disla's sentence under the abuse-of-discretion standard, we conclude that Disla has not carried his burden to demonstrate that the 365-month sentences are substantively unreasonable in light

40

of the totality of the circumstances of this case. The trial evidence showed that Disla repeatedly transported large amounts of narcotics into the United States both in connection with the controlled deliveries and independently. Moreover, he used his CBP credentials to conceal his offenses. In addition, the sentences imposed by the district court are within the advisory guidelines range, which is one of the factors to be considered in determining reasonableness. 18 U.S.C. § 3553(4)(A).

The sentences are not substantively unreasonable simply because the district court did not accord as much weight to the mitigating factors cited by Disla as he would have liked. The district court imposed the sentences only after taking into account all of the aggravating and mitigating factors outlined in the PSI and raised by Disla both in his pleadings and at the sentencing hearing. The district court also explicitly stated at sentencing that it considered the statutory factors in § 3553(a) and that the sentences reflect the seriousness of the offenses, promote respect for the law, provide just punishment, protect the public, and provide adequate deterrence. The district court did not abuse its discretion in not giving more weight to Disla's arguments of sentencing manipulation and his diminished mental capacity, particularly given the district court's findings that (1) Disla did not demonstrate that the government's conduct was fundamentally unfair, and (2) Disla's mental health issues did not interfere with his ability to control his actions.

41

This Court concludes that Disla has not carried his burden to show his 365-month sentences are substantively unreasonable given factors laid out in 18 U.S.C. § 3553(a).

**AFFIRMED.**